IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


MGPI PROCESSING, INC.; and
MGP INGREDIENTS, INC.,

        Plaintiffs,

v.                                   Case No. 20-2228-JWB

ALLIED WORLD ASSURANCE COMPANY
(UNITED STATES) INC.; and
INDIAN HARBOR INSURANCE COMPANY,

        Defendants.


## MEMORANDUM AND ORDER

This matter is before the court on motions for summary judgment by Defendants (Docs. 55, 84), motions for summary judgment by Plaintiffs (Docs. 88, 91), and motions to strike by Plaintiffs (Docs. 75, 119.)  The motions have been fully briefed and are ripe for decision.  (Docs. 58*[1], 64, 66*, 70, 72*, 73*, 75, 76, 85, 90, 93, 97*, 98*, 99*, 102, 103, 107*, 108*, 109*, 110, 112, 114, 117*, 118*, 120.)   For the reasons stated herein, Defendant Allied World's motion for summary judgment (Doc. 55) is GRANTED; Plaintiffs' motion for summary judgment against Allied World (Doc. 88) is DENIED; Defendant Indian Harbor's motion for summary judgment (Doc. 84) and Plaintiffs' motion for summary judgment against Indian Harbor (Doc. 91) are each GRANTED IN PART and DENIED IN PART; and Plaintiffs' motions to strike (Docs. 75, 11) are DENIED.

---

[1] Briefs and other documents that were filed under seal are indicated here with asterisks.

**I. Uncontroverted Facts**

**A. Overview**

The following statement is derived primarily from stipulated facts in the Pretrial Order. (Doc. 83 at 3-8.)  On October 21, 2016, a chemical release occurred at the facilities of MGPI Processing, Inc. ("MGPI") in Atchison, Kansas.  The release occurred at about 8 a.m. after a third-party supplier delivering sulfuric acid transferred it to the wrong storage tank, causing the acid to mix with sodium hypochlorite and producing a chemical reaction that released toxic emissions into the air.  The emissions migrated from the air above MGPI's property and allegedly caused bodily injury and property damage to third parties in and around Atchison.  On and shortly after October 21, more than one hundred people sought treatment from nearby hospitals and other medical institutions for bodily injuries allegedly caused by the chemical release.

At the time of the release, MGP Ingredients, Inc. ("MGP") was the named insured on a Scheduled Location Pollution Liability Policy issued by Allied World Assurance Company ("Allied World").  The policy was a claims-made policy, meaning it generally applied to claims asserted during the policy period.  MGPI was an Additional Named Insured under the policy.  The MGPI property and facilities in Atchison were a Scheduled Location under the policy.  The policy had a liability limit for New Conditions (i.e., new pollution conditions) coverage of $10,000,000, with a deductible of $250,000.  Plaintiffs did not renew the Allied World policy; it was cancelled effective January 1, 2018, with no returned premium due.  MGP did not purchase an Optional Extended Reporting Period.

In November 2017, Plaintiffs or their representatives contacted Indian Harbor Insurance Company ("Indian Harbor") about providing a Pollution and Remediation Legal Liability insurance policy to MGP.  The October 21, 2016 release was disclosed to Indian Harbor during

the underwriting process.  Indian Harbor issued a Pollution and Remediation Legal Liability Policy to MGP, with a policy period of January 1, 2018, through January 1, 2021.  Endorsement 21 to the policy adopted a Retroactive Date of February 25, 2015.  MGP and MGPI were both named insureds and the Atchison facility where the 2016 release occurred was a Covered Location under the policy.  The policy provided a limit of liability for Pollution Legal Liability coverage of $15,000,000, with a self-insured retention of $250,000.

In the months immediately following the 2016 release, Plaintiffs and Allied World cooperated on a plan to address potential bodily injury claims and mitigate their exposure to liability.  Part of the plan was to pay medical expenses for third parties who sought medical treatment at area providers, including Atchison Hospital, within days following the release.  MGP provided Allied World documentation of these expenses including a spreadsheet with partially anonymized patient information prepared by Atchison Hospital.  One of the partially anonymized patient records has now been identified as pertaining to Ann Conner.  Another patient record – which was not anonymized – pertained to a minor, referred to in the briefs as "Claimant DC." In January 2017, Allied World agreed to pay, as strategic response costs, the expenses in the spreadsheet (plus an administrative fee) in a total amount of $229,821.60.  Allied World ultimately paid the hospital and other providers about $325,000 in medical bills, which was above the policy limit for strategic response costs.  (Doc. 97 at 8.)  The patients on whose behalf these bills were paid were not required to sign a release of claims against Plaintiffs.  Allied World also paid Plaintiffs' outside counsel its defense costs.

After the January 1, 2018 effective date of the Indian Harbor policy, Plaintiffs' outside counsel continued to communicate with Allied World about third-party bodily injury claims; Indian Harbor was not included in those communications.

In September 2018, Ann Conner filed suit against MGPI in Atchison County seeking damages for bodily injuries from the 2016 release. Plaintiffs notified Allied World of the Ann Conner lawsuit on October 2, 2018. Plaintiffs did not notify Indian Harbor at that time. In October 2018, multiple other claimants filed a lawsuit against MGP in Wyandotte County for bodily injuries from the 2016 release. The plaintiffs in the Wyandotte County suit included Edwin and Anne Banister, Max and Sharon Berry, Jody Flaugher, and Cheryl Reynolds. Plaintiffs promptly notified Allied World of the Wyandotte County suit; they did not notify Indian Harbor at that time. The Banisters settled with Plaintiffs and no longer assert claims. Prior to September 2018, Plaintiffs never received any communications from Ann Conner, Max and Sharon Berry, Jody Flaugher, Cheryl Reynolds, or Claimant DC.

Around November 16, 2018, Allied World's adjuster informed Plaintiffs that the Allied World policy had expired on December 31, 2017 and requested that Plaintiffs place Indian Harbor on notice of the 2016 release. On December 4, 2018, Allied World issued a letter denying coverage for the Ann Conner and Wyandotte County lawsuits. The letter asserted that the claims in those lawsuits were not first made before the policy expired. In January 2019, Plaintiffs provided evidence to Allied World that Ann Conner was one of the anonymous patients listed in the hospital spreadsheet for whom Allied World had previously paid medical expenses.

Plaintiffs notified Indian Harbor of the Ann Conner and Wyandotte County lawsuits in or before December 2018. Indian Harbor declined coverage for the lawsuits (hereafter referred to collectively as "the Underlying Lawsuits") in a letter dated April 25, 2019. The letter stated the claims were excluded by Endorsement 24 in the policy, which in part excluded coverage based on "Constituents related to prior claim(s)."

In August 2019, MGPI and Ann Conner entered into a settlement agreement and the Ann Conner lawsuit was dismissed.

Claimant DC asserted a claim against Plaintiffs by letter dated September 23, 2020, seeking damages for bodily injury from the release. Plaintiffs provided notice of the claim to both insurers, but both declined coverage. The demand of Claimant DC and the Underlying Lawsuits are hereafter referred to collectively as "the Underlying Claims."

Plaintiffs contend Allied World is obligated to defend against and provide coverage for the Underlying Lawsuits, as well as for any subsequent demands by others (including Claimant DC) insofar as these claimants previously had medical expenses paid by Allied World relating to the 2016 release, because the claims now asserted by these persons are a continuation of claims first made prior to cancellation of the Allied World policy on January 1, 2018. (Doc. 83 at 12.) Plaintiffs additionally contend Indian Harbor is obligated to defend against and provide coverage for the Underlying Claims because the claims were made and reported to Indian Harbor within the policy period, and because no policy exclusion applies to the claims. (*Id.* at 13.) Plaintiffs deny that the Indian Harbor policy exclusion in Endorsement 24 pertaining to prior claims applies to these claims. (*Id.*) Plaintiffs assert claims for breach of contract and for declaratory relief. (*Id.* at 17.)

**B. Allied World Policy**

The Allied World policy generally promised to pay loss Plaintiffs became legally obligated to pay because of bodily injury resulting from a pollution incident at Plaintiffs' Atchison facility. (Doc. 58 at 5.) One condition required that "[t]he claim is first made against [Plaintiffs] during the policy period and reported to [Allied World] … during the policy period or extended reporting period, if applicable." (*Id.*) The policy period was originally from February 25, 2015 to February

25, 2018, but the policy was cancelled as of January 1, 2018, at Plaintiffs' request.  (*Id.* at 2; Doc. 66 at 5.)

The policy defined "claim" as "a demand by a third party seeking a remedy and alleging liability or responsibility on the part of the insured."  (Doc. 58 at 35.)  The definition of "loss" included "[m]onetary judgment, award or settlement of compensatory damages for bodily injury…."  (*Id.* at 37.)

The policy further stated that if it was cancelled or not renewed, and the insured does not purchase other insurance to replace it, the insured is entitled to a 90-day Automatic Extended Reporting Period, which commences on the date the policy period ends, and which covers a claim first made during that 90-day period.  (*Id.* at 29.)  The insured could also purchase coverage for an Optional Extended Reporting Period of up to 36 months, but Plaintiffs did not purchase that coverage.

The policy contained a condition entitled "Notice of Possible Claim," which provided in part that if, during the policy period, the insured "becomes aware of a possible claim," the insured may provide notice of it to Allied World.  (*Id.* at 31.)  Provided the insured has maintained, on a continuous and uninterrupted basis, consecutive policies of insurance by Allied World providing substantially the same coverage as this policy, "any possible claim which subsequently becomes a claim made against [the insured] and reported to [Allied World] under any consecutive policy, shall be deemed to have been first made and reported during the policy period of this policy."  (*Id.* at 31-32.)   After the 2016 release, Plaintiffs did not maintain continuous coverage under consecutive policies with Allied World; they cancelled the policy on January 1, 2018.

Endorsement No. 6 provided that Allied World would pay on the insured's behalf, in addition to coverage available elsewhere in the policy, "strategic response costs arising from a

strategic management event first commenced during the policy period," as well as "strategic management loss" arising from such an event, up to separate limits of $250,000.  (*Id.* at 11.)  The endorsement stated that payment of such costs or loss would not constitute a determination of Allied World's rights or obligations under any other part of the policy and would not waive any defense to coverage.  (*Id.*)  "Strategic Management Event" was broadly defined to include an occurrence that may result in damages covered by the policy in excess of the deductible and also result in significant adverse media coverage, including from man-made disasters such as explosions.  (*Id.* at 13.)  "Medical expenses" were identified as one type of Strategic Response Cost.  (*Id.* at 14.)

### C.  Indian Harbor Policy

The Indian Harbor policy "requires that a claim be made against the insured during the policy period and reported to [Indian Harbor] during the policy period or, where applicable, the extended reporting period." (Doc. 1-2 at 17.)  Its Pollution Legal Liability coverage promised that Indian Harbor will pay on behalf of the insured for loss and related legal expense resulting from any pollution condition on, at, under or migrating from a covered location, which the insured has or will become legally obligated to pay as a result of a claim first made against the insured during the policy period and reported to Indian Harbor in writing during that period.  (*Id.*)

Under the policy, "Loss" includes a "monetary judgment, award or settlement of compensatory damages … arising from [bodily injury]."  (*Id.* at 18.) "Claim" means "any demand(s), notice(s) or assertions of a legal right alleging liability or responsibility on the part of the [insured]" and includes but is not limited to lawsuits, petitions, and orders.  (*Id.*)  Plaintiff's Atchison facility was a covered location under the policy.  (*Id.* at 31.)  "Policy period" means "the period stated in Item 2. of the Declarations…."  (*Id.* at 19.)  The policy period was listed in

Declaration 2 as from January 1, 2018 to January 1, 2021.  (*Id.* at 14.)  The exclusions in the policy included No. 15, entitled "Retroactive Date," which states that the policy coverage does not apply "based upon or arising out of any POLLUTION CONDITION that commenced prior to the Retroactive Date … which includes any dispersal, migration or further movement of the aforementioned POLLUTION CONDITION on or after the Retroactive Date…."  (*Id.* at 23.) Endorsement 21 contained various "Retroactive Dates" for different covered locations, including a February 25, 2015 Retroactive Date for Plaintiffs' Atchison facility.  (*Id.* at 54.)

Endorsement 24, which is a "Contamination Exclusion – Multiple Covered Locations," modifies the pollution liability policy by amending the exclusions in the policy as follows:

| This Policy does not apply to any of the following coverages including any related LEGAL EXPENSES: | Based upon or arising from the following Constituents (including any breakdown daughter or derivative products of such Constituents): | In or affecting the following Media: | Where such Constituent(s) is/are: | COVERED LOCATION |
|---|---|---|---|---|
| X Other (see below): Endorsement #105i, Business Interruption and Extra Expense | >As related to construction or demolition: for all constituents until construction activities are completed and / or Certificate of Occupancy (COO) is provided to XL for buildings to be occupied. | All media | X on, at, or under | Any COVERED LOCATION |
| x Other (see below): All coverages. | >Constituents related to prior claim(s)<br><br>>Any open fine & penalties issue.<br><br>>To be clear for intent, constituents related to mold or mold-like material which may migrate from COVERED LOCATION, possible related to product evaporation | All media | X on, at, or under<br><br>X  migrating from | Any COVERED LOCATION |

| x REMEDIATION EXPENSE | >TPH<br><br>>2-methylnaphthalene | soil | X on, at, or under | MGP Lawrenceburg Processing Facility, approximately 78-acre location at 7 Ridge Avenue, Lawrenceburg, IN |
|---|---|---|---|---|
| x REMEDIATION EXPENSE | >Any demolition debris, waste & debris. | Demolition materials and accumulated waste & debris | X on, at, or under | Any COVERED LOCATION |

| x REMEDIATION EXPENSE | >constituents related to rail road related materials.<br><br>>Constituents related to current or former coal storage areas. | All media | X on, at, or under | Any COVERED LOCATION |
|---|---|---|---|---|

With respect to this exclusion, in the event a No Further Action (NFA) letter(s) or similar documentation has been issued by the applicable regulatory authority(ies) which states that No Further Action is required with respect to the Constituents excluded by this endorsement, this endorsement may be deleted or modified by the Company for those Constituents that are the subject of the NFA or similar documentation, upon Company review and approval, which approval shall not be unreasonably withheld or delayed.

It is further agreed that such deletion or modification shall not be effective until the Company issues an endorsement deleting or modifying this specific endorsement. In no event shall the Company be liable for any LOSS, REMEDIATION EXPENSE, LEGAL EXPENSE or any other coverage granted by deleting or modifying this endorsement that: (1) arose prior to the effective date of the endorsement deleting or modifying this specific endorsement; or (2) were incurred to achieve such No Further Action status.

All other terms and conditions remain the same.

(Doc. 1-2 at 57-58) (relevant portions underlined).  In sum, under Exclusion 24 there is no coverage "based upon or arising from … Constituents related to prior claims… in or affecting all media … where such Constituent are on, at, or under, [or] migrating from … any COVERED LOCATION."

## II.  Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc*., 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts

showing a genuine issue for trial. *Id.* Any statement of fact that has not been controverted by affidavit or an exhibit is deemed to be admitted. D. Kan. Rule 7.4. Also, the court will only consider facts based on personal knowledge or supported by exhibits. Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III. Analysis

### A. Allied World – summary judgment motions. (Docs. 55, 88.)

**1. Governing law.** The parties agree that Kansas law governs Plaintiffs' claims against Allied World. (Doc. 83 at 2.) Under Kansas law, the interpretation of an insurance policy is a question of law for the court. *See First Fin. Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515, 519 (1998). In construing the policy, the court should consider it as a whole and construe it in a way that will give effect to the parties' intent. *Am. Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1058, 179 P.3d 1104, 1109 (2008) (citation omitted). If the policy language is unambiguous, the court must take the unambiguous language "in its plain, ordinary, and popular sense." *Id*. If language in the policy is ambiguous, the court construes the terms in favor of the insured. *Id*. "The test in determining whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean." *Id*. at 1110. "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Gerdes v. Am. Family Mut. Ins. Co.*, 713 F. Supp. 2d 1290, 1296 (D. Kan. 2010) (citing *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840

P.2d 456 (Kan. 1992)). *See Taylor v. LM Ins. Corp.*, No. 19-1030-JWB, 2020 WL 4000958, at *2 (D. Kan. July 15, 2020).

In determining whether a claim is covered under the policy, the insured bears the burden of proving that the claim falls within the policy. *Magnus, Inc. v. Diamond State Ins. Co.*, 101 F. Supp. 3d 1046, 1054 (D. Kan. 2015). The insurer then has the burden to prove that an exclusion in the policy precludes coverage of the claim. *Id.* "Generally, exceptions, limitations, and exclusions to insurance policies require narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms." *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 37, 200 P.3d 419, 426 (2009) (citation omitted). *See Taylor*, 2020 WL 4000958, at *3.

   2. **Analysis**

Allied World contends it is entitled to summary judgment because none of the claimants on the Underlying Claims made a claim against Plaintiffs during the policy period.  (Doc. 58 at 18-21.)  For the Allied World New Conditions coverage to apply, the policy requires, among other things, that a pollution incident "result[] in a claim for bodily injury" and "[t]he claim is first made against [Plaintiffs] during the policy period and reported to [Allied World], in writing, during the policy period…."  (Doc. 1-1 at 23.)  The court concludes Plaintiffs have failed to cite evidence from which a jury could reasonably find that, as to the Underlying Claims, the person allegedly injured by the 2016 release first made a claim against Plaintiffs during the policy period.[2]  "Claim" is defined in the policy to mean "a demand by a third party seeking a remedy and alleging liability

---

[2] Plaintiffs cite evidence that Allied World defended and funded settlements on claims asserted by Ann Bannister in February 2018 and Emily Bunch in July 2018.  (Doc. 97 at 12.)  The fact that Allied World did so despite the failure of these individuals to assert a claim during the policy period, however, is immaterial to the clear and unambiguous requirements of the policy.  Moreover, Plaintiffs do not allege any waiver or estoppel theory with respect to any unresolved claims at issue in this case.  *See* Doc. 83 at 12, 17.

or responsibility on the part of the insured." (*Id.* at 35.)  Three things are thus required for a claim: 1) a demand by a third party; 2) that seeks a remedy; and 3) that alleges liability or responsibility on the part of the insured.  Plaintiffs cite no evidence that Ann Conner, Claimant DC, or any other person now asserting a claim made a demand on Plaintiffs in 2016, or anytime during the policy period, to pay their medical bills and alleged that Plaintiffs were liable or responsible for the bills. Rather, Plaintiffs cite evidence that Allied World knew that there was a large number of people who sought medical treatment as a result of the release; that Plaintiffs got frequent calls from Atchison Hospital after the release; that attorneys "were 'floating around' the hospital … telling people to call them"; and that Plaintiffs got calls from some unnamed patients who had been treated and wanted to know if Plaintiffs were going to pay their medical bills.  (*See* Doc. 97 at 5-6.)  There can be no doubt that everyone involved knew Plaintiffs might face a significant number of bodily injury claims – Plaintiffs in fact cite Allied World documents from 2016 discussing "potential" third-party bodily injury claims – and that this is why Plaintiffs and Allied World proactively paid the hospital bills of persons who received medical treatment.  But the fact remains that coverage under the unambiguous terms of the Allied World policy was triggered only by the making of a claim – a demand – for reimbursement by a third party who alleged that Plaintiffs were legally responsible for the expense.  The record is missing any such evidence.  In response to the incident and to calls from the hospital and from some unidentified patients, Plaintiffs and Allied World decided to pay the hospital bills of all persons treated shortly after the release, in what was an obvious effort to dissuade people from asserting claims against Plaintiffs.  Such a preemptive effort to stave off claims was surely a sensible way of mitigating liability – and was thus beneficial both to Plaintiffs and Allied World – but its rationale drives home the point that the injured persons had not yet actually asserted any "claims" against Plaintiffs when Plaintiffs and Allied World decided

13

to pay the hospital bills.  And absent a claim within the policy period, Allied World had no contractual obligation under the New Conditions coverage to indemnify Plaintiffs for those expenses.

Plaintiffs argue at length the foregoing conclusion is inconsistent with the policy's language on Strategic Response Costs.  (Doc. 97 at 16-17.)  Specifically, Plaintiffs note the latter coverage is available only for expenses "reasonably likely to be covered by the policy" and argue Allied World's allocation of medical expenses to that coverage is an indication the expenses were within the New Conditions coverage.  (*Id.* at 17.)  But as Plaintiffs concede, Strategic Response Cost coverage, unlike New Conditions coverage, "does not require the existence of a third-party claim for damages," and the policy provides that payment of Strategic Response Costs "will not constitute a determination of [Allied World's] rights or obligations under any other part of the policy."  (*Id.* at 16.)  Plaintiffs cite nothing to contradict or undermine the definition in the policy requiring that a claim consist of a demand and an allegation of liability or responsibility.  Plaintiffs also contend Allied World "treated the medical expense payments as 'claims' at all relevant times." (*Id.* at 18.)  But regardless of the fact that Allied World may have sometimes referred to the medical expenses as "claims" and the underlying patients as "claimants," or that Allied World's payments for Strategic Response Costs apparently exceeded the policy's limits on such costs, or even that Allied World may have paid to defend and settle some claims after expiration of the policy (*see id*. at 18-20), the plain requirements for a "claim" within the meaning of the policy were not satisfied without a demand for a remedy and an allegation that Plaintiffs were liable for the costs. As to the Underlying Claims, the uncontroverted facts show no such demands or allegations prior to cancellation of the Allied World policy.  And with respect to Allied World's conduct during the policy period and the suggestion that its conduct is inconsistent with its subsequent denial of

coverage, it again bears pointing out that Plaintiffs have not asserted any sort of waiver or estoppel theory in the pretrial order.

Plaintiffs argue the closest analogue to this case is *Coffeyville Res. Ref. & Mktg., LLC v. Illinois Union Ins. Co.*, No. 08-1204-MLB, 2015 WL 11090388, *4 (D. Kan. Feb. 25, 2015), where the district court rejected an insurer's argument that no claim had been asserted within the meaning of the policy. That case is distinguishable, however, because there was evidence at trial that property owners affected by an oil discharge "made written demands seeking remedies against Coffeyville Resources" that were "submitted in the course of the settlement programs administered by" a company acting on behalf of Coffeyville Resources. That system had been set up, as the relevant insurers knew, to "facilitate[e] the processing and settlement of property owners' demands." *Id.* Under those circumstances, the district court concluded that "the written submissions for payment under these programs" qualified as claims within the meaning of the policy. *Id.* Moreover, the district court had earlier denied summary judgment on this issue by noting that Coffeyville Resources "was faced with more than one class-action complaint asserted on behalf of all individuals who sustained damage as a result of the oil release," which the court found "constituted written claims against [Coffeyville Resources]." *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 714 F. Supp. 2d 1119, 1168 (D. Kan.), *on reconsideration in part*, 748 F. Supp. 2d 1261 (D. Kan. 2010). By contrast, Plaintiffs cite no evidence that persons claiming injury from the discharge in this case "made written demands seeking remedies" against Plaintiffs and alleged that Plaintiffs were responsible for their injuries. Rather, Plaintiffs rely on the fact that these persons "appeared at Atchison Hospital" and "complained of injuries sustained as a result of [the] exposure," together with Atchison Hospital's submission of a patient expense spreadsheet, as the equivalent of a claim. (Doc. 97 at 22.) Insofar as the hospital's involvement

is concerned, Plaintiffs make no showing that the hospital itself asserted a claim against Allied World within the meaning of the policy.  The uncontroverted facts show the hospital provided medical care to injured persons and then cooperated in Plaintiffs' initiative to provide documentation and to facilitate payment of treatment expenses.  That evidence, however, falls short of the facts presented in *Coffeyville Resources* and, more to the point, falls short of the standard required for coverage under the plain terms of the Allied World policy.

Based on the foregoing determinations, the court finds Allied World's motion for summary judgment (Doc. 55) should be GRANTED and Plaintiffs' motion for summary judgment as to Allied World (Doc. 88) should be DENIED.

**B.  Indian Harbor – summary judgment motions.  (Docs. 84, 91.)**

**1.  Governing law**.  The Indian Harbor policy provides in part that "[a]ll matters arising hereunder including questions relating to the validity, interpretation, performance, and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules)."

 "Under New York law, courts interpreting the terms of an insurance contract must 'give effect to the intent of the parties as expressed in the clear language of the contract.'"  *Great Lakes Ins., S.E. v. Gray Grp. Invs*., LLC, No. CV 20-2795, 2021 WL 3124495, at *4 (E.D. La. July 23, 2021) (citations omitted).  As summarized in a recent case:

> An insurance contract governed by New York law is interpreted "like any other contract." *Traynor v. John Hancock Mut. Life Ins. Co*., 273 N.Y. 230, 7 N.E.2d 112, 114 (1937). Unambiguous provisions are given "their plain and ordinary meaning." *Vigilant Ins. Co. v. Bear Stearns Cos., Inc*., 10 N.Y.3d 170, 855 N.Y.S.2d 45, 884 N.E.2d 1044, 1047 (2008). An insurance contract is unambiguous when "there is no reasonable basis for a difference of opinion." *White v. Cont'l Cas. Co*., 9 N.Y.3d 264, 848 N.Y.S.2d 603, 878 N.E.2d 1019, 1021 (2007). When interpreting an insurance contract, courts consider the views of "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally

understood in the particular trade or business." *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co*., 472 F.3d 33, 42 (2d Cir. 2006). When an insurance policy "may be reasonably interpreted in two conflicting manners, its terms are ambiguous and any ambiguity must be construed in favor of the insured and against the insurer*." Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins*. Co., 28 N.Y.3d 675, 49 N.Y.S.3d 65, 71 N.E.3d 556, 560 (2017) (internal citations and quotation marks omitted).

*Northwell Health, Inc. v. Lexington Ins. Co.*, No. 21-CV-1104 (JSR), 2021 WL 3139991, at *4 (S.D.N.Y. July 26, 2021). "If the 'language is unambiguous, the court will discern the parties' intent from the document itself as a matter of law.'" *Great Lakes Ins., S.E.*, 2021 WL 3124495, at *4 (citations omitted). The foregoing case explained the role of extrinsic evidence in interpreting such a contract under New York law:

> If the court finds that any terms of the contract are ambiguous, the burden shifts to the insurer to prove that its proposed interpretation of the policy is the correct one. At this stage, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract. If the extrinsic evidence is so one-sided that no reasonable person could decide the contrary, the court may resolve the ambiguity as a matter of law. Otherwise, the extrinsic evidence must be interpreted by the factfinder. Where the ambiguity cannot be resolved by examining extrinsic evidence of the parties' intentions—either as a matter of law or as a matter of fact—the court should construe the ambiguous language against the insurer.

*Great Lakes Ins., S.E.*, 2021 WL 3124495, at *5 (quotation marks, citations, and punctuation omitted).

2. **Analysis**.

i. **Coverage**. Indian Harbor alleges that it and Plaintiffs "agreed that the policy would not insure any claims related to the ***known*** 2016 Chemical Incident Claim," and that this agreement "was reduced to a contamination exclusion contained in an endorsement to the Indian Harbor Policy." (Doc. 85 at 2) (bold and italics in original). Indian Harbor asserts that Endorsement 24 "unambiguously bars coverage for the Underlying Lawsuits," but Plaintiffs have "resort[ed] to a picayune and tortured parsing" of the exclusion to argue otherwise. (*Id.* at 3.)

It should first be noted that it is clear the Underlying Claims fall within the coverage of the Indian Harbor policy unless they are excluded by Endorsement 24.  The policy itself promises (in part) that Indian Harbor will pay for loss resulting from any pollution condition on, at, under or migrating from any covered location (including the Atchison facility) that the insured has or will become legally obligated to pay as a result of a claim first made against the insured during the policy period.  The policy period is from January 1, 2018 to January 1, 2021.  Endorsement 21 modifies the pollution liability coverage by adopting a "Retroactive Date" of February 25, 2015 for Plaintiffs' Atchison facility.  (*Id.* at 54.)  Although the policy does not define or explain the retroactive date, it surely means a pollution condition arising after the retroactive date and otherwise within the policy period, such as the 2016 release, qualifies for pollution liability coverage.[3]  The Ann Conner lawsuit, the Wyandotte County lawsuit, and the demand of Claimant DC were all filed and reported to Indian Harbor within the policy period.  A policy exclusion (as well as Endorsement 15) excludes any pollution condition existing prior to the policy inception date that was known to the insured and not disclosed in writing to Indian Harbor in application materials. (*Id.* at 21, 46.)  On the other hand, a pollution condition disclosed in writing to Indian Harbor "is deemed to be first discovered on the date a COVERED LOCATION is endorsed onto" the policy.  (*Id.* at 46.)  It is undisputed that the 2016 release was disclosed to Indian Harbor prior to execution of the policy.

Turning to the language of Endorsement 24, the court rejects Indian Harbor's argument that it clearly and unambiguously excludes the Underlying Claims.  Had Indian Harbor wanted to exclude "any claims related to the October 21, 2016 chemical release" at Plaintiffs' Atchison

---

[3] Exclusion No. 15, entitled Retroactive Date, states the policy does not provide coverage for loss arising out of any pollution condition that commenced prior to the retroactive date, including any migration or further movement of the pollution condition after the retroactive date.  (Doc. 102 at 23.)

facility, as it now contends, it could have done so easily enough.  Instead, it adopted a chart with various elements that seemingly mixes past and present events and whose application to the Underlying Claims is uncertain at best.  Cobbling together the various portions of the chart, the exclusion effectively provides that "this policy does not apply to … all coverages … based upon or arising from … Constituents related to prior claim(s) … in or affecting all media, where such Constituent(s) is/are on, at, or under, [or] migrating from … any COVERED LOCATION."  (*See* Doc. 1-2 at 57.)  It is not clear how this excludes the disputed claims. As an initial matter, the endorsement is not a "Prior Claim Exclusion" directed at "prior claims," as Indian Harbor argues, but a "Contamination Exclusion" directed at "coverage based on or arising from … *constituents related to prior claims.*"[4]  Assuming the toxic gas that migrated from Plaintiffs' facility on October 21, 2016 is the relevant "constituent," pollution coverage for a claim based upon the gas is excluded, according to the endorsement: (1) if that gas is "related to prior claims," and (2) "where [the gas] is … on, at, … under.. [or] migrating from" the covered location.  As Plaintiffs point out, the latter clause uses only present tense – i.e., it applies where the constituent "*is ... migrating from*" the property rather than "was migrating" or "has migrated" – suggesting the exclusion does not apply if the gas is no longer present or migrating.[5]  Thus, one reasonable construction from the use of the present tense is that the exclusion applies only if the constituent that previously gave

---

[4] The exclusionary language itself is somewhat circular.  Instead of stating that the listed items are excluded from coverage, it states that "[t]his policy does not apply to any of the following coverages…: All coverages…."  In other words, it says the policy does not apply to the coverage in the policy.

[5] Indian Harbor also argues this interpretation is inconsistent with the pollution liability coverage, which promises to pay for "LOSS … resulting from any POLLUTION CONDITION on, at, under or migrating from" a covered location. (Doc. 1-2 at 17.)  It argues this provision would have to be construed as a present-tense limitation as well.  But the subject of the coverage provision is loss "resulting from" the pollution condition, a phrasing that presumes the loss occurred after a pollution condition has occurred at a covered location.  By contrast, Endorsement 24 applies only "*where such constituent(s) is/are* … on, at, or under … or migrating from" a covered location. Thus, the former provision addresses loss from pollution that *was* on or migrating from a covered location before the loss, while the latter provision excludes coverage for a constituent related to a prior claim if the constituent *is* on, under, or migrating from such a location.

rise to a claim is still present on or migrating from the covered location during the Indian Harbor policy period. Construed in this manner and together with other provisions, this particular exclusion could be intended to limit coverage for ongoing contamination, but not from past contamination, and as such would not apply to the Underlying Claims. In other words, it applies to a constituent that poses a continuing threat because it "is … on … [or] migrating from" a covered location.

Indian Harbor argues the foregoing is an unreasonable construction. It asserts that "[t]he only prior claim was the 2016 Chemical Incident Claim, and the constituents related to the 2016 Chemical Incident Claim were not migrating from a covered location on January 1, 2018," such that Endorsement 24 "would not exclude anything … [and] would be rendered meaningless…." (Doc. 85 at 18.) As an initial matter, Indian Harbor's argument mischaracterizes the 2016 chemical release as a "claim," apparently to better place it within Endorsement 24. But the policy defines "claim" as a demand or assertion of a legal right alleging liability on the part of the insured. The 2016 release was a "pollution condition" (Doc. 1-2 at 19), not a "claim." (*Id.* at 18.) As for the merits of the argument, Indian Harbor cites no authority for the proposition that interpretation of an exclusion is necessarily unreasonable if it does not operate to exclude a particular claim.

"While the rights and obligations of parties under insurance contracts should be determined by the specific language of the policies, if the language of the policy is susceptible of two reasonable meanings, the parties may submit extrinsic evidence of their intent at the time of contracting" *Carlson v. Am. Int'l Grp., Inc.*, 30 N.Y.3d 288, 302, 89 N.E.3d 490, 498 (2017) (quoting *Newin Corp. v. Hartford Acc. & Indem. Co.*, 62 N.Y.2d 916, 919, 479 N.Y.S.2d 3, 467 N.E.2d 887 (1984)). Indian Harbor cites extrinsic evidence that allegedly shows the parties intended to exclude the Underlying Claims from coverage. For example, Indian Harbor sent out a

document during the underwriting process with an endorsement list that referred to a Contamination Exclusion and which stated that the endorsement would "exclude all coverages as related to recent claim, #___" [sic].  Indian Harbor also cites a notation by its underwriter in an internal document referring to the 2016 chemical release and stating, "We exclude this from ALL coverage."  Additionally, it points out that Plaintiffs notified and continued to seek coverage from Allied World, not Indian Harbor, in 2018 as claims relating to the release were asserted, which according to Indian Harbor shows Plaintiffs understood the Indian Harbor policy excluded coverage. (Doc. 85 at 20-22.)  None of this evidence, however, casts light on the parties' mutual understanding of the particular language of the exclusion or shows the parties had an understanding that any claims related to the 2016 release would be excluded from the Indian Harbor coverage. Indian Harbor's internal comments and documents show only its own subjective beliefs or contentions about coverage, not a meeting of the minds about the particular language or scope of the policy.  As for the document sent out by Indian Harbor indicating a Contamination Exclusion would "exclude all coverages as related to recent claim #___," Indian Harbor cites no evidence that Plaintiffs actually received that document.  Even assuming they did, the document contained no reference to the 2016 release and cannot reasonably be said to indicate a mutual understanding that claims from the release would be excluded.  Indian Harbor also cites evidence that its underwriter visited Plaintiffs' facility in April 2018.  Following a tour in which Plaintiffs showed "all of the corrective actions they had taken to prevent a recurrence" of the 2016 release, the parties had a meeting and the underwriter went through the policy "page-by-page," including Endorsement 24.  (Doc. 85 at 9.)  Indian Harbor cites no evidence, however, that there was any explanation or discussion of its contention that the endorsement excluded all claims relating to the 2016 release.  Finally, the fact that Plaintiffs did not notify or seek coverage from Indian Harbor

when demands and lawsuits relating to the 2016 release were first made in 2018 does not reasonably show an understanding that the Indian Harbor policy excluded coverage. Allied World indicated to Plaintiffs until late 2018 that it would cover such claims. When it finally denied coverage, Plaintiffs turned to Indian Harbor. Because Plaintiffs had no indication until then that Allied World would deny coverage, Plaintiffs' earlier failure to seek coverage from Indian Harbor does not show that Plaintiffs understood the Indian Harbor policy excluded coverage. Moreover, that conclusion is only bolstered by the fact that the Indian Harbor policy has a provision making its coverage excess of any other collectable insurance.

Under New York law, summary judgment is appropriate when either "the language of the contract provision is wholly unambiguous" or "the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Kennedy v. Basil*, No. 18-CV-02501 (ALC), 2021 WL 1226768, at *9 (S.D.N.Y. Mar. 31, 2021) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 232 F.3d 153, 157-158 (2d Cir. 2000) (citations omitted)). Thus, summary judgment is appropriate "regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Id*. (citations omitted.)

The court concludes Plaintiffs are entitled to summary judgment insofar as they contend the Underlying Claims are not excluded by Endorsement 24 and therefore come within the pollution liability coverage of the Indian Harbor policy. "When it comes to exclusions from coverage, the exclusion 'must be specific and clear in order to be enforced' … and ambiguities in exclusions are to be construed 'most strongly' against the insurer …." *Heartland Brewery, Inc. v. Nova Cas. Co*., 149 A.D.3d 522, 523, 52 N.Y.S.3d 55, 57 (2017) (citations omitted.) In fact, New

York has recognized that an insurer "bears the burden of proving that the exclusion: (1) 'is stated in clear and unmistakable language'; (2) 'is subject to no other reasonable interpretation'; and (3) 'applies in the particular case.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. TransCanada Energy USA, Inc*., 52 Misc. 3d 455, 462, 28 N.Y.S.3d 800, 807 (N.Y. Sup. Ct. 2016), *aff'd* 153 A.D.3d 1153, 61 N.Y.S.3d 4 (2017) (citations omitted).  In addition, ambiguities in an insurance policy are usually construed against the insurer as the policy's drafter. *Id.* (citing *Dean v. Tower Ins. Co. of New York*, 19 N.Y.3d 704, 955 N.Y.S.2d 817, 979 N.E.2d 1143 (2012)).

All of these elements weigh against Indian Harbor, which has not shown the exclusion is "clear and unmistakable" or that it is unreasonable to construe it as Plaintiffs have suggested. Under the circumstances, Plaintiffs are entitled to judgment for coverage of the Underlying Claims. In a nutshell, Indian Harbor sold Plaintiffs a claims-made pollution liability policy knowing of the 2016 release.  Indian Harbor chose to adopt a February 25, 2015 Retroactive Date, thus bringing the 2016 release within the potential scope of coverage. Indian Harbor drafted a Contamination Exclusion that can reasonably be construed as allowing coverage of such claims because the exclusion is limited to a constituent that resulted in prior claims and that "is on" or "is migrating from" the insured's property during the policy period. Despite Indian Harbor's assertion that the parties agreed to exclude claims related to the 2016 release, it apparently never discussed the exclusion of claims arising from that incident with Plaintiffs and included no clear language excluding such claims from coverage.   Claims for bodily injury from a pollution condition were made against Plaintiffs within the policy period by Ann Conner, the Wyandotte County plaintiffs, and Claimant DC arising from a constituent that was not on or migrating from Plaintiffs' property during the policy period.  Plaintiffs are entitled to coverage of those claims.

   ii.  **Relief.**

Plaintiffs' motion for summary judgment seeks the following relief. Plaintiffs seek judgment as to Count 4 of the Amended Complaint stating that Indian Harbor owed a duty to defend MGP against the Underlying Claims brought by Ann Connor, the Wyandotte County lawsuit claimants,[6] and Claimant DC pursuant to the terms of the policy, and must reimburse MGP for its reasonable defense costs incurred to date for the Underlying Claims. (Doc. 91 at 1.) The court finds Plaintiffs' motion as to this request should be granted. In addition to indemnification for loss, the policy promised that Indian Harbor will pay "related LEGAL EXPENSE" resulting from a covered pollution condition. (Doc. 102 at 17.) As to Count 5, Plaintiffs seek judgment stating that Indian Harbor has a duty to indemnify MGP for its loss in the form of the settlement it entered with Ann Conner. (Doc. 91 at 1.) The court concludes the motion should be granted as to this request for reasons previously discussed. As to Count 6, Plaintiffs seek a declaratory judgment "that Indian Harbor has an ongoing duty to defend MGP in connection with any to-be-incurred defense costs or expenses associated with the [Wyandotte County lawsuit claimants] and Claimant DC, as well as a duty to indemnify MGP for the settlement or any other resolution of those claims." (*Id.*) The court concludes the motion should be granted as to this request as well, at least insofar as it seeks a declaration that Indian Harbor owes MGP a duty to indemnify it for loss and legal defense reasonably incurred on the Underlying Claims, including on the claims asserted by the Wyandotte County lawsuit claimants and Claimant DC.

In the pretrial order, Plaintiffs assert a right to recover defense and settlement payments of $739,452.21 (as of May 6, 2021), prejudgment interest of ten percent under K.S.A. 16-201, as well as attorney fees under K.S.A. 40-256. (Doc. 83 at 19.) Plaintiffs' motion for summary judgment against Indian Harbor does not raise these issues; the court accordingly makes no determination at

---

[6] Max and Sharon Berry, Jody Flaugher, and Cheryl Reynolds. (Doc. 90 at 10, n.2.)

this point on these issues. Allied World's motion for summary judgment, which the court grants, disposes of these claims as they pertain to Allied World.

In the amended complaint and the pretrial order, Plaintiffs also seek relief relating to "potential future claims" and/or "dormant claims that may be revived in the future." (Doc. 41 at 9; 83 at 19.) Indian Harbor asserts, without any contrary showing by Plaintiffs (Doc. 103), that the policy requires that a claim be made and reported to Indian Harbor during the policy period and the policy period has now expired with no claims other than the Underlying Claims being made and reported in that period. As such, it argues that any "potential future claims" or other non-reported claims would not be covered by the Indian Harbor policy. (Doc. 85 at 23.) Insofar as Plaintiffs request relief pertaining to any such non-reported claims, the court agrees with Indian Harbor that, outside of the Underlying Claims, any such claims are not covered by the policy. Indian Harbor is accordingly entitled to summary judgment on that issue.

**IV. Motions to Strike (Docs. 75, 119.)**

Plaintiffs have moved to strike two reply briefs (one filed by each Defendant) because they exceed the court's page limitations. The court considered whether to strike these briefs, which in fact substantially exceed this judge's limits as set forth in a standing order, but ultimately concluded it would not strike them. There are two reasons for this. First and foremost, Defendants claim they relied on a scheduling order which indicated the only applicable page limitation was that the argument-and-authorities section of briefs must not exceed thirty pages. (Doc. 26 at 10.) The scheduling order failed to note the undersigned's additional page limits, although these limits are ordinarily included in such orders. Because of that oversight, the court is not inclined to strike the briefs. The second reason for not doing so is that the excess briefing has had no effect on the outcome of the motions and striking the briefs or allowing additional briefing would only cause

unnecessary delay. Most of Defendants' excess pages consist of excessive and contentious repetition of matters elsewhere addressed. In fact, the vast majority of material facts in this case appear to the court to be undisputed, although the parties have failed to set forth a clear statement of facts and have submitted such a welter of briefs, exhibits, and arguments that it was difficult simply to read them. The court is not about to ask for additional briefing on the matters raised. Going forward, however, the court will enforce the undersigned's page limitations on all briefing in this matter.

### V. Conclusion

Allied World's motion for summary judgment (Doc. 55) is GRANTED. Plaintiffs' motion for summary judgment against Allied World (Doc. 88) is DENIED.

Indian Harbor's motion for summary judgment against Plaintiffs (Doc. 84) is GRANTED IN PART and DENIED IN PART. As discussed in this order, the motion is GRANTED as to "potential future claims" and/or "dormant claims that may be revived in the future" against Plaintiffs. Indian Harbor has no obligation to indemnify Plaintiffs for such claims or defend Plaintiffs from such claims. Indian Harbor's motion is otherwise DENIED. Conversely, Plaintiffs' motion for summary judgment against Indian Harbor (Doc. 91) is GRANTED IN PART and DENIED IN PART as stated in this order. The court determines Indian Harbor is obligated to indemnify and defend Plaintiffs on the Underlying Claims identified in this order.

Plaintiffs' motions to strike (Docs. 75, 119) are DENIED. IT IS SO ORDERED this 10th day of September, 2021.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE